1  Lewis P. Geyser (SBN 35942)
   *lewpg57@gmail.com*
2  715 Cuatro Caminos
   Solvang, CA  93463
3  Tel.: (805) 688-2106
   Fax: (805) 895-5271
4
   Daniel L. Geyser (SBN 230405)
5  *daniel.geyser@strismaher.com*
   Douglas D. Geyser (SBN 314342)
6  *douglas.geyser@strismaher.com*
   STRIS & MAHER LLP
7  Three Energy Square
   6688 N. Central Expy., Ste. 1650
8  Dallas, TX  75206
   Tel.: (214) 396-6634
9  Fax: (213) 261-0299

10 Attorneys for Plaintiffs
   Lewis P. Geyser, Robert B. Corlett,
11 and T. Lawrence Jett

12            **UNITED STATES DISTRICT COURT**

13           **CENTRAL DISTRICT OF CALIFORNIA**

14 LEWIS P. GEYSER, ROBERT B.          Case No. 2:17-cv-07315
   CORLETT, and T. LAWRENCE JETT,
15                                     **REPLY IN SUPPORT OF MOTION**
                Plaintiffs,            **FOR SUMMARY JUDGMENT**
16                                     **PURSUANT TO FED. R. CIV. P. 56**
           v.                          **AND OPPOSITION TO**
17                                     **DEFENDANTS' MOTION FOR**
   UNITED STATES OF AMERICA;           **SUMMARY JUDGMENT**
18 U.S. DEPARTMENT OF THE
   INTERIOR; U.S. BUREAU OF            Date:       June 1, 2018
19 INDIAN AFFAIRS, a division of the   Time:       10:00 a.m.
   United States Department of the     Location:   U.S. Courthouse
20 Interior; RYAN ZINKE, in his official            350 W. 1st St., 8th Floor
   capacity as Secretary of the Interior;           Courtroom 8C
21 MICHAEL S. BLACK, in his official                Los Angeles, CA
   capacity as Acting Assistant Secretary  Judge:  Hon. Dolly M. Gee
22 of Indian Affairs; AMY DUTSCHKE,
   in her official capacity as Director,
23 Pacific Region, Bureau of Indian
   Affairs,
24
                Defendants.
25

26

27

28

---

REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT IN CASE NO. 2:17-CV-07315

# TABLE OF CONTENTS

Introduction ........................................................................................................... 1

Argument ............................................................................................................... 3

I.    The government's kitchen-sink challenge to plaintiffs' standing defies controlling precedent ................................................................................... 3

    A.    *Patchak* confirms that nearby property owners have Article III standing to challenge fee-to-trust acquisitions ......................... 5

    B.    The Supreme Court has confirmed that individuals may sue to enforce structural rights in the Constitution ............................... 9

II.    The agency's decision violates constitutional checks on federal power over sovereign state land ................................................................... 14

    A.    The government flouts the text, purpose, and binding interpretations of the Enclave Clause ............................................................. 15

    B.    The government flouts *Hawaii*'s unambiguous reasoning ................ 18

    C.    The Constitution does not grant Congress the power to oust state sovereignty over state land, much less in direct contravention of specific constitutional safeguards ......................................... 19

        1.    The Indian Commerce Clause does not allow the federal government to exceed other constitutional limits ................... 19

        2.    The federal government cannot exercise exclusive authority over state land simply because it bought the land ............... 21

III.    The government's response cannot be squared with the controlling statutory text ....................................................................................................... 23

Conclusion ............................................................................................................ 24

i

# TABLE OF AUTHORITIES

**Cases:**

*Adams* v. *United States*, 319 U.S. 312 (1943) ............................................................2, 23

*Alden* v. *Maine*, 527 U.S. 706 (1999) ..............................................................................18

*Bond* v. *United States*, 564 U.S. 211 (2011) ............................................................*passim*

*Bush* v. *Lucas*, 462 U.S. 367 (1983) ..................................................................................4

*City of Roseville* v. *Norton*, 219 F. Supp. 2d 130 (D.D.C. 2002) ................................14

*Clarke* v. *Secs. Indus. Ass'n*, 479 U.S. 388 (1987) ........................................................10

*Duke Power Co.* v. *Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59 (1978) ...............7, 8

*Fort Leavenworth R.R. Co.* v. *Lowe*, 114 U.S. 525 (1885)............................................22

*Free Enter. Fund* v. *Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010)..........12

*Hawaii* v. *Office of Hawaiian Affairs*, 556 U.S. 163 (2009) ..............................*passim*

*James* v. *Dravo Contracting Co.*, 302 U.S. 134 (1937) ................................2, 9, 15, 16

*Langley* v. *Ryder*, 778 F.2d 1092 (5th Cir. 1985).........................................................20

*Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*, 134 S. Ct. 1377 (2014).........10

*Massachusetts* v. *EPA*, 549 U.S. 497 (2007)....................................................................8

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians* v. *Patchak*,
    567 U.S. 209 (2012) ...................................................................................*passim*

*Mescalero Apache Tribe* v. *Jones*, 411 U.S. 145 (1973)...........................................18, 21

*Mescalero Apache Tribe* v. *New Mexico*, 630 F.2d 724 (10th Cir. 1980)....................21

*Munoz* v. *Mabus*, 630 F.3d 856 (9th Cir. 2010) ...........................................................20

*Nat'l Wildlife Fed.* v. *Burford*, 871 F.2d 849 (9th Cir. 1989) ........................................7

*Neighbors of Casino San Pablo* v. *Salazar*, 773 F. Supp. 2d 141 (D.D.C. 2011) ......14

*Nevada* v. *Hicks*, 533 U.S. 353 (2001) ...........................................................................21

*Nevada* v. *Watkins*, 914 F.2d 1545 (9th Cir. 1990) .....................................................21

*New York* v. *United States*, 505 U.S. 144 (1992) ...............................................10, 18, 20

*NLRB* v. *Noel Canning*, 134 S. Ct. 2550 (2014)...........................................................12

*No Casino in Plymouth* v. *Jewell*, 136 F. Supp. 3d 1166 (E.D. Cal. 2015) ............14, 18

*Patchak* v. *Salazar*, 632 F.3d 702 (D.C. Cir. 2011) ........................................................5

*Patchak* v. *Salazar*, 646 F. Supp. 2d 72 (D.D.C. 2009) ..................................................5

*Paul* v. *United States*, 371 U.S. 245 (1963) ..........................................................2, 15, 23

*Santa Rosa Band of Indians* v. *Kings Cty.*, 532 F.2d 655 (9th Cir. 1975) ..................20

*Seminole Tribe of Fla.* v. *Florida*, 517 U.S. 44 (1996).......................................2, 19, 20

*Surplus Trading Co.* v. *Cook*, 281 U.S. 647 (1930) .......................................................22

*The Presbyterian Church (USA)* v. *United States*, 870 F.2d 518 (9th Cir. 1989)..........4

*United States* v. *Bohn*, 622 F.3d 1129 (9th Cir. 2010) ..................................................22

*United States* v. *Cornell*, 25 F. Cas. 646 (D.R.I. 1819) ................................................15

*United States* v. *McGowan*, 302 U.S. 535 (1938) .........................................................22

*United States* v. *McIntosh*, 833 F.3d 1163 (9th Cir. 2016) ..........................................11

*United States* v. *Roberts*, 185 F.3d 1125 (10th Cir. 1999) ...........................................20

*United States* v. *Students Challenging Regulatory Agency Procedures (SCRAP)*,
    412 U.S. 669 (1973) ................................................................................................7

*Yankton Sioux Tribe* v. *Podhradksy*, 606 F.3d 994 (8th Cir. 2010) .............................20

**Constitution and statutes:**

U.S. Const., Art. I, § 8, Cl. 8 .............................................................................*passim*

U.S. Const., Art. I, § 8, Cl. 17.............................................................................*passim*

5 U.S.C. 702....................................................................................................................4

40 U.S.C. 3112 .................................................................................................*passim*

40 U.S.C. 3112(b) .........................................................................................................23

40 U.S.C. 3112(c) .........................................................................................................23

ii

**Miscellaneous:**

2 Max Farrand, *The Records of the Federal Convention of 1787* (Yale University Press 1911) ...................................................................................................2, 10

*The Federalist No. 43* (James Madison)........................................................................15

13A *Fed. Practice & Procedure* § 3531.4 (3d ed. 2017)................................................7

Harold Pierce, *Congress urges county to start talks with Chumash: Ultimatum delivered during Congressional hearing*, Lompoc Record (June 17, 2015) ............13

REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT IN CASE NO. 2:17-CV-07315

## INTRODUCTION

Plaintiffs' opening motion demonstrated that, by purporting to exercise exclusive jurisdiction over the Camp 4 property, the federal government violated constitutional and statutory protections over sovereign state land. The Enclave Clause prevents the federal government from exercising such exclusive jurisdiction without obtaining the State's consent; indeed, the Framers explicitly added the consent requirement to limit the government's ability to purchase and unilaterally control state land. Under 40 U.S.C. 3112, Congress mirrored the Enclave Clause's requirements and "conclusively presume[d]" that the government lacks jurisdiction absent consent. And under Supreme Court precedent, the government cannot "reserve or convey" state land that was not reserved to the United States at the time of the State's admission to the Union. *Hawaii* v. *Office of Hawaiian Affairs*, 556 U.S. 163, 176 (2009).

The government's opposition is baseless. Before addressing the merits, it wastes nearly a third of its brief challenging Plaintiffs' standing on multiple grounds, every one of which is foreclosed by the Supreme Court's decisions in *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians* v. *Patchak*, 567 U.S. 209 (2012), and *Bond* v. *United States*, 564 U.S. 211 (2011). *Patchak* clearly holds that nearby property owners have standing to challenge a fee-to-trust acquisition that imposes "economic, environmental, or aesthetic" harms. 567 U.S. at 227-228. And *Bond* just as clearly holds that individuals may challenge governmental actions that represent "[i]mpermissible interference with state sovereignty." 564 U.S. at 225. The government may not agree with these decisions, but it cannot simply ignore them.

The government devotes much effort to contesting standing because its merits arguments are weak. As for the Enclave Clause, the government looks everywhere but the clause's text, purpose, and authoritative interpretations. It spurns the text, which authorizes the government "[t]o exercise exclusive Legislation" over land it acquires only with "the Consent of the Legislature of the State." U.S. Const., Art. I, § 8, Cl. 17. It ignores the purpose, which was to prevent the government from "enslav[ing] any

1

particular State by buying up its territory."[1] And it disregards controlling precedent, which unequivocally declares that without consent the land remains under "the jurisdiction of the State." *James* v. *Dravo Contracting Co.*, 302 U.S. 134, 141 (1937). The Supreme Court has expressly recognized "the freedom of the state and its admitted authority to refuse or qualify cessions of jurisdiction when purchases have been made without consent." *Id.* at 149-150. It is undisputed that no consent was obtained here, so the unavoidable conclusion is that the United States' "possession" remains "simply that of an ordinary proprietor." *Paul* v. *United States*, 371 U.S. 245, 264 (1963).

As to *Hawaii*, the government brushes the case aside because it did not specifically address fee-to-trust acquisitions for Indians. But Supreme Court precedent is not so easily dismissed. The *reasoning* of that case squarely encompasses attempts to unilaterally withdraw sovereign state land from state and local jurisdiction.

And as with the Enclave Clause, the government simply has no answer for the plain text of 40 U.S.C. 3112. Even the government's own authority explains that if the government does not comply with Section 3112's "method," then the government has "'no jurisdiction at all.'" *Adams* v. *United States*, 319 U.S. 312, 314 (1943).

The government looks to sidestep these checks on its power by contending that the Indian Commerce Clause provides plenary authority to do whatever it pleases regarding Indian affairs. The government again ignores Supreme Court precedent. As Plaintiffs explained, the Indian Commerce Clause "cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction." *Seminole Tribe of Fla.* v. *Florida*, 517 U.S. 44, 73 (1996). That result only makes sense; if the government could disregard the Enclave Clause whenever it owns land, that clause and its consent requirement would be superfluous.

Under the government's view, it could buy up all private land in California and turn nearly the entire State into an Indian reservation (or do anything else within its

---

[1] 2 Max Farrand, *The Records of the Federal Convention of 1787*, at 510 (Yale University Press 1911).

1   Article I powers), no matter how much California might protest. The Framers wisely
2   foresaw that possibility and deliberately acted to prevent it. The government's position
3   here cannot be squared with this simple point. The core of federalism is that the federal
4   and state governments balance each other. Requiring the State's consent puts the two
5   sovereigns on equal footing, allowing the State to condition its consent on retaining
6   certain powers. The BIA decisions are unlawful for steamrolling this unambiguous
7   constitutional and statutory requirement. Summary judgment for Plaintiffs should be
8   granted.

9                                        **ARGUMENT**

10  **I.    THE     GOVERNMENT'S     KITCHEN-SINK     CHALLENGE     TO**
11  **        PLAINTIFFS' STANDING DEFIES CONTROLLING PRECEDENT**

12          As previously explained (Mem. 16-18), Supreme Court precedent confirms
13  Plaintiffs' standing to challenge the Assistant Secretary's decision to oust all state and
14  local jurisdiction over Camp 4. See *Match-E-Be-Nash-She-Wish Band of Pottawatomi*
15  *Indians* v. *Patchak*, 567 U.S. 209 (2012); *Bond* v. *United States*, 564 U.S. 211 (2011).[2]
16  *Patchak* explains that property owners near fee-to-trust land "are reasonable—indeed,
17  predictable—challengers" of acquisition decisions that harm "economic,
18  environmental, or aesthetic" interests in violation of local laws. 567 U.S. at 227-228.
19  And *Bond* explains that individuals "can assert injury from governmental action taken
20  in excess of the authority that federalism defines." 564 U.S. at 220. There is no serious
21  argument that Plaintiffs' suit falls outside these principles.

22          Before the acquisition, Camp 4 was subject to all state and local land-use laws,
23  and was designated as rural land. AR194.96. But the acquisition purports to remove
24  Camp 4 from that jurisdiction. *E.g.*, AR258.92 (Regional Director decision);
25  AR194.165 (Final Environmental Assessment: "Santa Barbara County would no

26  _____
27  [2] The government argues that "nothing in *Patchak* or *Bond* alleviates their obligation to
    establish constitutional and prudential standing for each of their claims." Gov't Mem.
    10. This is a strawman. Plaintiffs never contended they did not have to establish
28  standing; they pointed out that *Patchak* and *Bond* make Plaintiffs' standing obvious.

1   longer retain land use jurisdiction over the project site after it is taken into trust, and

2   the current zoning and land use designations assigned to the project site would no

3   longer apply."). The anticipated development includes 143 residences, 12,000-square-

4   feet of tribal facilities for up to 40 tribal employees (including a meeting hall for up to

5   100 annual events), and a 250-space parking lot. AR194.29-AR194.31.[3] That

6   development will plainly harm the rural character of the Santa Ynez Valley and the

7   Plaintiffs' lifestyles there, increase traffic, detract from the aesthetic qualities of the

8   Valley, increase pollution, and decrease property values. See Appendix, *infra*; cf.

9   AR194.166 (stating that the tribal facilities "are not consistent with local land use plans

10  or existing land uses"). Any of those tangible and intangible harms readily satisfies the

11  standing inquiry. Indeed, those exact injuries in the identical context of anticipated

12  development of fee-to-trust land established standing in *Patchak*. And *Bond*

13  exhaustively detailed why individuals have prudential standing to enforce limits on the

14  federal government's power.

15      Despite *Patchak* and *Bond* finding standing for indistinguishable claims, the

16  government now challenges Plaintiffs' standing through six separate objections with

17  multiple sub-arguments. These attacks ignore the controlling logic of *Patchak* and

18  *Bond*, and serve only to distract from the real issues here. Plaintiffs plainly have

19  standing, and the Court should address the merits of their claims.[4]

20  _____

21  [3] The Tribe has agreed to develop Camp 4 in accordance with "Alternative B" in the environmental assessment. See Memorandum of Agreement, https://www.countyofsb.org/asset.c/3273.

22  [4] The government's "object[ion] to Plaintiffs' 'Statement of Facts'" (Gov't Mem. 7 n.5)

23  is confused. As the United States previously "agree[d]" (and the first line of their brief reflects), Plaintiffs bring suit under the APA *and* under the Constitution. Doc. 18 at 2;

24  cf., *e.g.*, *Bush* v. *Lucas*, 462 U.S. 367, 374 (1983). The government's standard of review (Gov't Mem. 7-9) is therefore twice wrong. First, the APA standard of review does not

25  govern Plaintiffs' free-standing constitutional claims. Second, even under the APA, a court is forbidden to "'substitute its judgment for that of the agency'" (*id.* at 8) only on

26  matters that Congress delegated to agency expertise. The BIA has no expertise in interpreting the Constitution or 40 U.S.C. 3112. (Moreover, the immunity waiver in 5

27  U.S.C. 702 covers non-APA claims as well. *E.g.*, *The Presbyterian Church (USA)* v. *United States*, 870 F.2d 518, 524 (9th Cir. 1989).)

28

**A.** *Patchak* **Confirms That Nearby Property Owners Have Article III Standing To Challenge Fee-To-Trust Acquisitions**

*Patchak* has already confirmed that a "nearby property owner" has standing to challenge an unlawful "acquisition of property 'for the purposes of providing land for Indians,'" where that acquisition "will cause him economic, environmental, and aesthetic harm." *Patchak*, 567 U.S. at 224. The plaintiff's harm there was materially identical to Plaintiffs' here. As here, Patchak's "lifestyle and community [would] be adversely affected by the proposed" development. *Patchak* v. *Salazar*, 646 F. Supp. 2d 72, 75 (D.D.C. 2009).[5] The D.C. Circuit found "*no doubt* that Patchak satisfied the standing requirements derived from Article III of the Constitution," *Patchak* v. *Salazar*, 632 F.3d 702, 704 (D.C. Cir. 2011) (emphasis added), and the Supreme Court affirmed that decision, again, fining the harm satisfied prudential standing. See 632 F.3d at 707 ("His stake in opposing the [land development] is intense and obvious."). The court of appeals explained that every prong of the Article III test was met, including that "the impact of the Band's facility on Patchak's way of life" was redressable by a decision finding the acquisition unlawful. *Ibid.*

To be sure, the Supreme Court did not explicitly address Article III standing. But the Court had an independent obligation to confirm its own jurisdiction, and the Court

---

[5] The full details of the harm were:

> Mr. Patchak will be disproportionately affected if the Property is placed in trust and the Gun Lake Band follows through with its plans to build a 200,000–square–foot casino complex that is anticipated to draw more than 3.1 million visitors a year. Such a casino would detract from the quiet, family atmosphere of the surrounding rural area. Among the negative effects of building and operating the anticipated casino in Mr. Patchak's community are: (a) an irreversible change in the rural character of the area; (b) loss of enjoyment of the aesthetic and environmental qualities of the agricultural land surrounding the casino site; (c) increased traffic; (d) increased light, noise, air, and storm water pollution; (e) increased crime; (f) diversion of police, fire, and emergency medical resources; (g) decreased property values; (h) increased property taxes; (i) diversion of community resources to the treatment of gambling addiction; (j) weakening of the family atmosphere of the community; and (k) other aesthetic, socioeconomic, and environmental problems associated with a gambling casino.

646 F. Supp. 2d at 75 n.5.

resolved a separate standing issue. It beggars belief to think the Court overlooked a jurisdictional issue *explicitly addressed at each stage below*, much less that it proceeded silently despite harboring doubts about its jurisdiction. See *Patchak*, 567 U.S. at 224 ("This Court has long held that a person suing under the APA must satisfy * * * Article III's standing requirements").

*Patchak* forecloses the government's challenge. Just like Patchak, Plaintiffs assert multiple "economic, environmental, [and] aesthetic" harms. 567 U.S. at 227-228. Compare *id.* at 213 (noting increased traffic, decreased property values, changes to lifestyle, and other harms), and 632 F.3d at 703-704, with Corlett Decl. ¶¶ 9-15 (alleging changes to lifestyle, character of the area, increased traffic, more pollution, environmental and aesthetic harms, decreased property values, and diversion of police and medical resources), Jett Decl. ¶¶ 6-14 (same), and Geyser Decl. ¶¶ 5-14 (same).

What is more, the BIA's own environmental assessment itself proves Plaintiffs' standing. It explains that, under the Santa Ynez Valley Plan, Camp 4 "lies in the Rural Area." AR194.96. "Characterized by large parcels, less development, and large-scale agricultural production, rural land within the SYVCP planning area *is considered valuable * * * for maintaining the rural character*." *Ibid.* (emphasis added). And the assessment confirms that the "County would no longer retain land use jurisdiction over the project site after it is taken into trust, and the current zoning and land use designations assigned to the project site would no longer apply." AR194.165. Camp 4's anticipated development will change the "rural character" that Plaintiffs value, and that development would not occur if the County "retain[ed] land use jurisdiction over the project." *Ibid.*; see Corlett Decl. ¶¶ 4, 9, 15; Jett Decl. ¶¶ 2, 4, 6-8, 14; Geyser Decl. ¶¶ 6, 14. This harm alone demonstrates standing.

In short, given *Patchak* and this record, the government's standing challenge is insubstantial. Camp 4's development poses precisely the same injuries as the casino development in *Patchak*, and that harm can be redressed the same way, *i.e.*, by preventing the development. *Patchak*, 632 F.3d at 704; see *Patchak*, 567 U.S. at 225-

227 & n.7. Every single argument the government raises on each prong of the Article III standing inquiry flouts this binding precedent.

*Injury in fact.* First, the government argues that the BIA determined that the "potential impacts" on Plaintiffs' interests were "*insignificant*." Gov't Mem. 11. But the BIA cannot assess how Plaintiffs value their way of life, and, in any event, injuries need not be "significant" to satisfy Article III. The Supreme Court has held that even a "'trifle is enough for standing,'" and it has rejected the United States' identical attempt "to limit standing to those who have been 'significantly' affected by agency action." *United States* v. *Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973); accord *Nat'l Wildlife Fed.* v. *Burford*, 871 F.2d 849, 854 (9th Cir. 1989). It is no surprise that identical allegations readily sufficed in *Patchak*.

Second, the government contends that Plaintiffs' harms are "speculative," "conjectural," and indistinguishable "from that of the general public." Gov't Mem. 11-12. This is frivolous after *Patchak*. No one doubts that Camp 4 is being developed— that is the whole point of the acquisition. *E.g.*, AR258.3440. The effects of that anticipated development are no different from the anticipated casino development in *Patchak*. See, *e.g.*, *Nat'l Wildlife Fed.*, 871 F.2d at 852 ("The actual or threatened injury may be aesthetic or recreational as well as economic."); cf. 13A *Fed. Practice & Procedure* § 3531.4 (3d ed. 2017) ("it has become routine to recognize standing in cases alleging a general injury to the physical environment.").[6]

Third, the government complains that Plaintiffs did not submit "declarations" showing "they have *actually* been harmed" or "any harm is imminent." Mem. 11. This is perplexing: the government *stipulated* that Plaintiffs did not have to submit declarations unless the government challenged standing. Given that Plaintiffs' standing

---

[6] If the government means that Plaintiffs' injuries mirror the general public's because the BIA's decision threatens similar harms to everyone, that is frivolous again. Every environmental claim, for instance, involves harms to every resident of the area. Cf., *e.g.*, *Duke Power Co.* v. *Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 73 (1978) ("environmental and aesthetic consequences of" pollution are "[c]ertainly" sufficient).

1    is obvious under *Patchak*, there was no reason to anticipate the government wasting

2    judicial or party resources with this meritless challenge.

3         *Causation*. With little explanation, the government challenges causation. It says

4    that "increases to traffic, population density, and increased demands on public

5    services" are not "even *relevant* to the" BIA's decisions, "let alone actually *caused by*"

6    them. Gov't Mem. 13. This, again, is perplexing. Had the decisions not removed Camp

7    4 from the Santa Ynez Plan, the Tribe would not be allowed to build 143 residences,

8    offices for up to 40 workers, and a meeting hall designed to host up to 100 events

9    annually. See AR194.96; AR194.165. This causal link is clearly *Patchak*, not *Palsgraf*.

10        The government next questions causation because, aside from Camp 4's

11   development, other "events could result in increases to traffic, population density, or

12   demand on public services." Gov't Mem. 13. This is frivolous. Other developments

13   surely could cause the same results; the point is that *this* development *also* causes this

14   result, and *it is unlawful*. The government's same objection would have applied to

15   *Patchak* or any other case that affects the environment. "[A] party seeking to invoke

16   federal jurisdiction" need not "negate the kind of speculative and hypothetical

17   possibilities suggested in order to demonstrate the likely effectiveness of judicial

18   relief." *Duke Power*, 438 U.S. at 77-78; see also, *e.g.*, *Massachusetts* v. *EPA*, 549 U.S.

19   497, 525-526 (2007) (in challenge to agency action regarding greenhouse gases,

20   brushing aside objection that other countries "are poised to increase" their own

21   emissions). The government, in short, asks this Court to defy binding precedent.

22        *Redressability*. The government's redressability arguments rehash its other

23   challenges. It writes that, "[u]nder local laws, development of the Property still could

24   have occurred, *even if limited*." Gov't Mem. 14 (emphasis added). This is incorrect—

25   it is undisputed that the anticipated development, with its anticipated magnitude, could

26   not occur under current law. Similarly, the government contends that "*any*

27   development, by anyone under any authority anywhere within the entire Santa Ynez

28   Valley, could lead to such 'harms' to Plaintiffs." Gov't Mem. 14. Not exactly. In the

8

REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT IN CASE NO. 2:17-CV-07315

government's view, a defendant can inflict serious harm on a plaintiff without judicial recourse, so long as the defendant can speculate that some other entity, hypothetically, might at some point inflict similar injuries. Unlawful imprisonment is not excused simply because the same victim might later be kidnapped. And the harms contemplated here stem directly from the development of a parcel outside existing legal parameters. A decision reinstating state and local authority would assuredly redress that harm.

Finally, the government suggests that had the United States "obtained the State of California's consent to create an exclusive federal enclave, then no state or local law would have applied at all." Mem. 14. That is like saying it is irrelevant that both Houses of Congress did not pass a bill because both Houses *might* have passed it. This lawsuit raises structural checks securing the division of power between the federal government and States. The point is that the government did not obtain California's consent, and had they been forced to honor the Constitution, California could have conditioned its consent on maintaining core aspects of state sovereignty—which is precisely why the Framers included the consent requirement. See, *e.g.*, *James* v. *Dravo Contracting Co.*, 302 U.S. 134, 147-148 (1937); Plaintiffs Mem. 1-2, 9-11.

At bottom, the government's actions impose an immediate end to local jurisdictional and legislative power over Camp 4. That ouster is designed to enable development that was prohibited under state and local law. Holding the government's action unlawful undoubtedly redresses Plaintiffs' injuries. See *Patchak*, 632 F.3d at 704 ("the impact of the Band's facility on Patchak's way of life constituted an injury-in-fact fairly traceable to the Secretary's fee-to-trust decision, an injury the court could redress with an injunction that would in effect prevent the Band from conducting gaming on the property").

### B.     The Supreme Court Has Confirmed That Individuals May Sue To Enforce Structural Rights In The Constitution

The government's attacks on Plaintiffs' prudential standing fare no better. As Plaintiffs explained, *Bond* leaves no doubt that "an individual" can sue to enforce

9

"[i]mpermissible interferences with state sovereignty." 564 U.S. at 225. That is not because Bond was a State, but because the "allocation of powers between the National Government and the States enhances freedom": "'[s]tate sovereignty is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power.'" *Id.* at 221 (quoting *New York* v. *United States*, 505 U.S. 144, 181 (1992)).

The Enclave Clause is quite obviously a provision maintaining "the constitutional balance between the National Government and the States." *Id.* at 222. As Plaintiffs explained (and the government made no effort to refute), the Enclave Clause's consent requirement (and thus Section 3112's consent requirement) exists to prevent the government from "enslav[ing] any particular State by buying up its territory." 2 Max Farrand, *The Records of the Federal Convention of 1787*, at 510 (Yale University Press 1911), available at http://oll.libertyfund.org/titles/farrand-the-records-of-the-federal-convention-of-1787-vol-2. The government does not once engage the clause's text or original meaning. Likewise, California's admission to the Union was a "uniquely sovereign" event with real "consequences." *Hawaii*, 556 U.S. at 176. Just as in *Bond*, these provisions ultimately protect individual liberty.

And Plaintiffs plainly fall within these provisions' zone of interests.[7] This test is not "'especially demanding.'" *Patchak*, 567 U.S. at 225 (quoting *Clarke* v. *Secs. Indus. Ass'n*, 479 U.S. 388, 399 (1987)). Claims fall outside the zone of interests of a constitutional or statutory provision "only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the" provision. *Ibid.* And "[t]he benefit of any doubt goes to the plaintiff." *Ibid.* Like the IRA in *Patchak*, the provisions invoked here involve "considerations of land use." *Id.* at 227. The Enclave Clause is concerned with sovereignty over land (as is Section 3112), and "the uniquely sovereign character" of California's admission prevents Congress from

---

[7] It is questionable that the zone-of-interests test even applies to constitutional claims after *Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*, 134 S. Ct. 1377 (2014).

10

REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT IN CASE NO. 2:17-CV-07315

imposing "a retroactive 'cloud' on the title" to the State's land, *Hawaii*, 556 U.S. at 176, again a guarantee regarding land. It is thus "reasonable—indeed, predictable"— that "neighbors to the use" of Camp 4 would bring suit to enforce these provisions. *Patchak*, 567 U.S. at 227. Because Plaintiffs obviously meet the zone-of-interests test (if it applies at all), *Bond* is accordingly dispositive on Plaintiffs' prudential standing.

The government's efforts to escape *Bond* are meritless. The government suggests that Plaintiffs merely allege "*harms [to] the State of California*." Gov't Mem. 16. Yet *Bond* states unequivocally that constitutional structures enhancing federalism have "more than one dynamic." 564 U.S. at 221. While "[t]he allocation of powers" protects States "in their own right," "individual[s]" *also* have "a direct interest in objecting to laws that upset the constitutional balance between the National Government and the States." *Id.* at 221-222. "Fidelity to principles of federalism is not for the States alone to vindicate." *Id.* at 222. The Supreme Court thus squarely rejected the notion that Bond was "assert[ing] the legal rights and interests of States and States alone." *Id.* at 220.

Nor can the government limit *Bond* to claims under the Tenth Amendment. *Bond*'s language sweeps broadly to all "constitutional principles of federalism," which is why it cites cases from multiple contexts. 564 U.S. at 222-224. And the Ninth Circuit understands *Bond* the same way: it permits "a litigant in a proper case [to] invoke" "both federalism and separation-of-powers constraints," because all such constraints "protect individual liberty." *United States* v. *McIntosh*, 833 F.3d 1163, 1174 (9th Cir. 2016). The government is free to ask the Supreme Court to overrule *Bond*, but it still applies in this Court.[8]

Next, without authority or explanation, the government declares that "economic, social, or quality-of-life" injuries "bear no relationship to the federalism concerns underlying the Enclave Clause, 40 U.S.C. § 3112, or other state sovereignty

---

[8] Nor can the government draw any distinction between Plaintiffs' interests and Bond's liberty interests. Contra Gov't Mem. 15. Standing turns on *any* cognizable interest, and (per *Patchak*) the interests asserted here are assuredly cognizable under Article III.

protections." Gov't Mem. 19. In other words, the government believes that *property-related* injuries are irrelevant to provisions designed to protect unlawful federal assertions *over property*. These provisions secure the division of power between the federal government and the States, so that local laws can address local issues. The government simply misunderstands basic elements of federalism.

Nor is the government correct that Plaintiffs raise merely "abstract issues of importance to the public at large." Gov't Mem. 16, 17. *Patchak*, again, involved whether a tribe was federally recognized in 1934, obviously an "issue of importance" that swept past the plaintiff there. Nor is *Patchak* an outlier: the Court has also permitted private parties to challenge the presidential line-item veto and legislative veto (see *Bond*, 564 U.S. at 223); presidential appointments in violation of the Recess Appointments Clause (*NLRB* v. *Noel Canning*, 134 S. Ct. 2550 (2014)); and limits on presidential authority to remove members from an administrative agency (*Free Enter. Fund* v. *Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010)), among others (see *Bond*, 564 U.S. at 223; cf., *e.g.*, *Lucia* v. *SEC*, No. 17-130 (U.S. oral arg. Apr. 23, 2018)). The "importance" of these issues is personal to these Plaintiffs, and that is sufficient to raise an Article III interest. See, *e.g.*, *Bond*, 564 U.S. at 221 (a "proper case or controversy" requires an "injury that is concrete, particular, and redressable").

The government continues that these issues are "most appropriately addressed in the representative branches," where Congress and the Interior have already "weighed" "the various interests at stake." Gov't Mem. 16, 17. That is cold comfort *to the State* that was left without a say (and the Plaintiffs who are left unprotected). These structural safeguards exist so the federal government cannot unilaterally decide when to supplant state and local power over significant swaths of state land. The federal government is free to weigh the "various interests" and *ask the State for its consent—* but the entire point is that the government must obtain that consent before moving forward. In any event, it is useful for Article I and Article II bodies to address certain issues; but it is an Article III power to decide whether the government's action violates

12

1    the Constitution and federal law. Those issues are "most appropriately addressed" in

2    the courts.

3         The government trumpets the fact that Santa Barbara County dropped its own

4    parallel lawsuit after reaching an agreement with the Tribe. Gov't Mem. 17 & n.8; see

5    Mem. of Agreement, http://www.countyofsb.org/asset.c/3273. This is misleading. The

6    agreement was not the product of ordinary, arm's-length negotiations. The County's

7    hands were tied by the BIA's unilateral withdrawal of state and county authority over

8    Camp 4. The agreement itself clarifies the decisions' drastic effects on the County's

9    negotiating position. The parties recited that the anticipated Camp 4 development is

10   not subject to the County's approval, and absent the agreement the County would have

11   no meaningful "opportunity to influence mitigation measures or seek compensation for

12   potential adverse environmental impacts." Mem. of Agreement at 1. Had the United

13   States not ousted state and local jurisdiction, the County would have its regular

14   authority over the development.

15        Moreover, as the agreement again recites, Congress was considering legislation

16   that "would ratify and confirm the actions of the Department of the Interior." Mem. of

17   Agreement at 2. The County had little choice but to negotiate at least some influence

18   over Camp 4.[9] The point of Plaintiffs' lawsuit, of course, is that the federal

19   government's exclusion of local authority is unconstitutional, and neither Congress nor

20   the Executive can force the County to negotiate a settlement with unlawful leverage.

21

22

23   _____

     [9] Congressmembers made clear that the County should reach an agreement or lose any
24   control. Harold Pierce, *Congress urges county to start talks with Chumash: Ultimatum
     delivered during Congressional hearing*, Lompoc Record (June 17, 2015), available at
25   http://lompocrecord.com/news/local/state-and-regional/congress-urges-county-to-
     start-talks-with-chumash/article_57d5f73a-2f8f-5520-81af-51a750c7d9a0.html;    see
26   also, *e.g.*, *Chumash Camp 4 agreement approved by Board of Supervisors*, Santa Ynez
     Valley Star (Oct. 31, 2017), available at http://www.santaynezvalleystar.com/chumash-
27   camp-4-agreement-passed-board-supervisors/  (Third  District  Supervisor:  "Some
     suggest we should just say no whatever the consequences—but in my experience, the
28   risks are too great a no will be overridden by Congress * * *. There are two paths
     forward and we can either watch [the bill] pass getting no controls or have some say.").

1      Finally, the government claims that Plaintiffs "ignore" other "cases dismissing

2 similar suits on standing grounds." Gov't Mem. 19. Those cases are non-binding and

3 irrelevant. Two pre-date *Bond* and are no longer good law. See *Neighbors of Casino*

4 *San Pablo* v. *Salazar*, 773 F. Supp. 2d 141 (D.D.C. 2011); *City of Roseville* v. *Norton*,

5 219 F. Supp. 2d 130 (D.D.C. 2002). The third, without explanation, rejected standing

6 with a single sentence and a citation to *City of Roseville* (without mentioning *Bond*).

7 *No Casino in Plymouth* v. *Jewell*, 136 F. Supp. 3d 1166, 1189 (E.D. Cal. 2015). This

8 scant authority cannot override *Bond*'s (subsequent) holding on the same point.

9      That this is the best the government can do only confirms the weakness of its

10 standing challenge. The Court should decide this case on the merits.

11 **II.**   **THE AGENCY'S DECISION VIOLATES CONSTITUTIONAL CHECKS**

12       **ON FEDERAL POWER OVER SOVEREIGN STATE LAND**

13      As previously established, the government's actions violate two independent

14 constitutional limits on federal power. *First*, the Enclave Clause forbids the

15 government from exercising exclusive jurisdiction over sovereign state land without

16 the State's consent. The Framers added the consent requirement precisely to prevent

17 Congress from purchasing property under state jurisdiction and ousting all local

18 control. That is exactly what happened here. *Second*, Congress did not reserve for itself

19 the Camp 4 property when California entered the Union, and "the uniquely sovereign

20 character of" admission prevents Congress from subsequently "reserv[ing] or

21 convey[ing]" that property. *Hawaii*, 556 U.S. at 176. Again, that is exactly what

22 happened here.

23      The government's response is inadequate. It ignores the text and original

24 understanding of the Enclave Clause, and it refuses to grapple with the Supreme

25 Court's key decisions. In the government's view, the federal government can purchase

26 sovereign state land and then do essentially whatever it wants. But while "it is not

27 unusual for the United States to own within a state lands which are set apart and used

28 for public purposes," that "ownership and use without more *do not withdraw the lands*

*from the jurisdiction of the state*." *James* v. *Dravo Contracting Co.*, 302 U.S. 134, 141 (1937) (emphasis added). No other result is compatible with the Enclave Clause's text or purpose. The Framers added the consent requirement precisely to "obviate[]" "[a]ll objections" to federal power to acquire and regulate state land. *The Federalist No. 43* (James Madison). If the federal government could exclusively regulate state land even without state consent—as the government contends here—then the Enclave Clause is a nullity. The government has no answer for this simple point.

Similarly, the government's position defies *Hawaii*'s unequivocal reasoning. The government says *Hawaii* is distinguishable because it did not mention the IRA, but that is no response to the Court's logic.

The government exceeded constitutional limits by extinguishing state and local jurisdiction without state consent. Plaintiffs' motion for summary judgment should be granted.

A.   **The Government Flouts The Text, Purpose, And Binding Interpretations Of The Enclave Clause**

The Enclave Clause does not prevent the federal government from acquiring land currently under state jurisdiction, but without the State's consent the government cannot exclude all state and local authority over the land. That is, absent consent, the land "'remain[s] part of [the State's] territory and within the operation of her laws.'" *Dravo*, 302 U.S. at 141-142. The government's position is "simply that of an ordinary proprietor." *Paul*, 371 U.S. at 264; see also, *e.g.*, *United States* v. *Cornell*, 25 F. Cas. 646, 648 (D.R.I. 1819) (Story, J.) ("But although the United States may well purchase and hold lands for public purposes, within the territorial limits of a state, this does not of itself oust the jurisdiction of sovereignty of such state over the lands so purchased."). And the consent requirement was not accidental. The Framers required consent to prevent exactly what the government is trying to do here: buy up state land and impose

exclusive federal authority over it. See Plaintiffs Mem. 1-2, 9-10.[10] Because the government concedes that it never received California's consent to exercise exclusive jurisdiction over this private property, its actions violate the Enclave Clause.[11]

As its primary response, the government argues that it did not actually exclude all state and local authority. Gov't Mem. 25-27, 28-29. But even the government acknowledges that the acquisition would make tribal jurisdiction "predominant" and grant the Tribe "sovereignty over" Camp 4. Gov't Mem. 25-26 (quoting AR258.92, AR258.3440). The government brushes aside these statements as simply describing "the jurisdictional changes that result from the acquisition of the Property in[to] trust." Mem. 26. But that is precisely *our* point: it is unconstitutional for the government to impose exclusive jurisdiction without state consent. The mechanism by which the government asserts that unconstitutional authority is irrelevant.

The government also accuses Plaintiffs of reading the decisions' language out of context. Gov't Mem. 26. While it is true that one quotation from the Regional Director's decision—that Camp 4 will "no longer be subject to State or local jurisdiction" (AR258.88)—comes from the Tribe's response, the government ignores that the Regional Director *agreed with that statement*. The director concluded: "Once the lands are placed under the jurisdiction of the Federal and tribal governments, the tribal right to govern the lands becomes predominant." AR258.92. And she explained that the trust acquisition "allows the Tribe to exercise its self-determination *and sovereignty* over the property," for otherwise "decisions concerning the use of the land *would be subject to the authority of the State of California and the County of Santa Barbara*." *Ibid.* (emphasis added). Moreover, the environmental assessment affirmed

---

[10] The federal government itself has confirmed the purpose of the consent requirement. See Compl. (Doc. No. 1) ¶ 30 & n.6.

[11] The State may not "affect the title of the United States or embarrass it in using the lands or interfere with its right of disposal," but that caveat is far different than completely "withdraw[ing] the lands from the jurisdiction of the State." *Dravo*, 302 U.S. at 141-142.

1  that Camp 4 would be "remov[ed]" "from the County's jurisdiction" (AR194.165), and

2  both the County and the Tribe understood the decision to mean what it said (see Mem.

3  of Agreement, *supra*, at 1-2). It is therefore the government, not Plaintiffs, that has

4  misread the language and "context" (Gov't Mem. 26) of the agency's statements.

5      The government also argues that the decisions do not "'oust' all state

6  jurisdiction," Gov't Mem. 26, because the government permits state and local

7  authorities to exercise criminal jurisdiction over the subject territory. *Id.* at 26-27, 28-

8  29. This is the same argument that Plaintiffs already refuted. Plaintiffs Mem. 3 n.2, 6

9  n.4. Exclusive jurisdiction is not *less* exclusive because the government exercises its

10  exclusive authority to return some power to the State. The government was able to

11  *return* that power only because it asserted exclusive jurisdiction in the first place. And

12  nothing prevents the government from changing its mind and withdrawing that limited

13  grant. That is exclusive jurisdiction in name and effect. The government, again, has no

14  response to this simple point.

15      Finally, the government reproduces an extended quotation from *Kleppe*, but

16  never explains how that decision helps its case. Gov't Mem. 28. It does not. First, as

17  previously explained (Plaintiffs Mem. 10 n.8), *Kleppe* addressed the government's

18  regulation of property that *already* was "public lands," 426 U.S. at 531, whereas the

19  entire point here is the government cannot transform state lands into "public lands"

20  (ousting state and local authority) without the State's consent. Second, the government

21  targets language addressing federal power under the Property Clause; but, as the

22  government concedes, the government here acted under the Indian Commerce Clause,

23  not the Property Clause. Gov't Mem. 1, 23. And neither general source of authority can

24  override the Enclave Clause's specific requirements.

25      The government's actions thus fall squarely within the Enclave Clause's

26  purview. The Enclave Clause's consent requirement was deliberately included by the

27  Framers, and the Supreme Court has repeatedly confirmed its importance. It does not

28  impose an insurmountable burden to achieving federal objectives; it simply ensures

17

1  that federal actions are taken with due regard for state interests. The government here

2  was required to obtain the State's consent, which it failed to do. It therefore cannot

3  supplant all state and local jurisdiction without violating the Constitution.

4  **B.    The Government Flouts *Hawaii*'s Unambiguous Reasoning**

5      The government's actions are unlawful for an independent reason: Once

6  California entered the Union, Congress lacked the power to withdraw from state

7  jurisdiction any lands not withheld at admission. See *Hawaii*, 556 U.S. at 176;

8  Plaintiffs Mem. 11-12. Admission is a "'uniquely sovereign" event with constitutional

9  consequences. *Hawaii*, 556 U.S. at 176.[12] Camp 4 was not withheld (as the government

10  concedes, Gov't Mem. 32), so it is too late now for the United States to unilaterally

11  take it back.[13]

12      In response, the government argues that *Hawaii* is "irrelevant" because it did not

13  address fee-to-trust authority and the property at issue was owned by the State, not a

14  private party. Gov't Mem. 31-32. But those factors made no difference to the Court's

15  holding, and the government never explains otherwise. *Hawaii* found that admission

16  has consequences for federal-state relations over land not reserved at admission.

17  Congress cannot use the IRA to remove Camp 4 from California's jurisdiction any

18  more than it could take property from Hawaii through a federal resolution.

19      The government relies upon *No Casino in Plymouth* for support, but that case is

20  unpersuasive. Like the government here, that court perfunctorily described *Hawaii* as

21

---

22  [12] The government misunderstands *Hawaii* when it discusses the Admissions Clause and
23  the Equal Footing Doctrine. Gov't Mem. 30-33. As *Hawaii* indicates, its principle does
    not derive from any particular clause but rather from the unique consequences of
    admission and the Constitution's structure and history. Cf., *e.g.*, *Alden* v. *Maine*, 527
24  U.S. 706, 713 (1999) (state sovereign immunity derives not from the Eleventh
    Amendment but from "the Constitution's structure, its history, and the authoritative
25  interpretations by this Court"); *New York* v. *United States*, 505 U.S. 144, 155-157
    (1992) (explaining that the Tenth Amendment is in a sense merely a "truism").

26  [13] Contrast, for instance, Nevada's Enabling Act, which did disclaim public lands in
    favor of the federal government (see *infra*) or New Mexico's similar Act (see *Mescalero*
27  *Apache Tribe* v. *Jones*, 411 U.S. 145, 149 (1973)). Plaintiffs' contention will not rewrite
    the law in every jurisdiction; it simply imposes a modest consent requirement before
28  the federal government may displace state jurisdiction over state territory.

1  "inapposite" merely because it did not "mention" "the specific issue" of an IRA fee-

2  to-trust decision. 136 F. Supp. 3d at 1189. That distinction is immaterial.

3       Contrary to the government's position, Supreme Court authority is not

4  "irrelevant" whenever it is not on all fours. *Hawaii*'s controlling *logic* dooms the

5  government's attempt to withdraw Camp 4 from state jurisdiction.

6       **C.    The Constitution Does Not Grant Congress The Power To Oust State**

7           **Sovereignty Over State Land, Much Less In Direct Contravention Of**

8           **Specific Constitutional Safeguards**

9       In an attempt to brush aside the Constitution's express limits on federal power,

10  the government invokes its broad authority under the Indian Commerce Clause. But

11  the Constitution's provisions must be read together, and one clause does not allow

12  precisely what the other forbids. The Constitution's safeguards have real effect, and

13  they are dispositive here.

14       **1.    The Indian Commerce Clause does not allow the federal**

15           **government to exceed other constitutional limits**

16       The government argues that the Constitution's checks on federal power are

17  irrelevant because the Indian Commerce Clause gives Congress "plenary authority

18  over Indian affairs." Gov't Mem. 23. But the Indian Commerce Clause does not

19  override other constitutional limits on federal authority. Mem. 12-14; see *Seminole*

20  *Tribe of Fla.* v. *Florida*, 517 U.S. 44 (1996). Like the government here, the petitioner

21  in *Seminole Tribe* argued that the Indian Commerce Clause gave Congress plenary

22  authority over Indian affairs. See 517 U.S. at 60. The Court nonetheless held that

23  Congress's power under that clause "cannot be used to circumvent the constitutional

24  limitations placed upon federal jurisdiction." *Id.* at 73.

25       Just so here. Whatever the exact extent of authority granted by the Indian

26  Commerce Clause, it cannot "circumvent the constitutional limitations" imposed by

27  the Enclave Clause and the sovereign consequences of California's admission to the

28  Union. Nor would any other result make sense. Congress *always* has to act pursuant to

some enumerated source of power. If Congress could overcome constitutional limits (like the Enclave Clause) merely by invoking an Article I power, those limits would be meaningless. Cf., *e.g.*, *New York* v. *United States*, 505 U.S. 144, 156 (1992) ("Congress exercises its conferred powers subject to the limitations contained in the Constitution.").[14] Moreover, if the federal government needs a State's consent to build forts and other military installations on state land—which are assuredly of top importance to the federal government—it is hard to see how the Indian Commerce Clause provides even greater authority, including the right to disregard the Enclave Clause in its entirety.

Rather than grappling with these points, the government instead invokes a Ninth Circuit decision from 1975 that allowed Congress to preempt zoning laws on an Indian reservation. See Gov't Mem. 23; *Santa Rosa Band of Indians* v. *Kings Cty.*, 532 F.2d 655 (9th Cir. 1975). That case did not address the Enclave Clause, and it obviously said nothing about *Seminole Tribe*. The same goes for the government's other out-of-circuit decisions. See *Yankton Sioux Tribe* v. *Podhradsky*, 606 F.3d 994 (8th Cir. 2010); *United States* v. *Roberts*, 185 F.3d 1125 (10th Cir. 1999); *Langley* v. *Ryder*, 778 F.2d 1092 (5th Cir. 1985). In short, the government's best authority says precisely *nothing* about Plaintiffs' particular claims. Cf., *e.g.*, *Munoz* v. *Mabus*, 630 F.3d 856, 860 n.3 (9th Cir. 2010) ("'Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.'") (citation omitted).

Finally, the government argues that because the "'Indians' right to make their own laws and be governed by them does not exclude all state regulatory authority on the reservation,'" "trust land does not constitute a federal enclave from which all state jurisdiction is ousted." Gov't Mem. 24-25 (quoting *Nevada* v. *Hicks*, 533 U.S. 353,

---

[14] The government distorts language from *New York* by cutting a sentence in half (Gov't Mem. 15 n.7). The second half of that sentence states that "if a power is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress." 505 U.S. at 156.

361 (2001)). This only means that the mere creation of trust land does not oust all state law. Plaintiffs agree. Again, Plaintiffs do not challenge the government's authority to acquire land in trust for the Tribe. But what the government cannot do—what the Constitution *forbids* the government from doing—is assert exclusive authority over that trust land to the exclusion of state and local control, including in matters of traditional state concern. The government has failed to justify that extraordinary assertion of federal power. See *Bond*, 564 U.S. at 225 ("Impermissible interference with state sovereignty is not within the enumerated powers of the National Government").

### 2. The federal government cannot exercise exclusive authority over state land simply because it bought the land

The government also attempts to evade limits on its power by arguing that state laws regulating federal property are preempted if they conflict with "the national purposes for which such land is used." Gov't Mem. 21. The government is wrong. No such broad principle exists, and for good reason—it would effectively nullify the Enclave Clause. The government cites a variety of cases to support its point, but Plaintiffs already explained why they are distinguishable.

First, where the land is *already* federal land, of course state laws cannot interfere with federal laws. See, *e.g.*, Plaintiffs Mem. 10 n.8; *Kleppe*, 426 U.S. at 531 (addressing property that was already "public lands"); *New Mexico* v. *Mescalero Apache Tribe*, 462 U.S. 324, 325-326 & n.1 (1983) (addressing Indian reservation that had been created before New Mexico even became a state (see *Mescalero Apache Tribe* v. *New Mexico*, 630 F.2d 724, 731 (10th Cir. 1980) (explaining that New Mexico's Enabling Act placed the land under federal jurisdiction)); *Nevada* v. *Watkins*, 914 F.2d 1545, 1550 (9th Cir. 1990) (likewise addressing federal land[15]). But as the government concedes, before the

---

[15] Section 5 of Nevada's Enabling Act disclaimed public lands, which "remain at the sole and entire disposition of the United States." https://www.leg.state.nv.us/Division/Research/Library/Documents/HistDocs/1864Act.pdf.

fee-to-trust decision, Camp 4 was private land subject to state and local jurisdiction. The provisions Plaintiffs invoke protect that type of land; by contrast, the government's power over its own property (as original public land or land conceded to the federal government) is entirely irrelevant to the government's attempt to oust all state and local control over sovereign state land.

Second, while the government recognizes an exception to its status as an "ordinary proprietor" when purchasing land (Gov't Mem. 22), it misunderstands the scope of that exception. As Plaintiffs explained, state laws cannot frustrate federal objectives as to federal *instrumentalities*. See Plaintiffs Mem. 9 n.6; *Fort Leavenworth R.R. Co.* v. *Lowe*, 114 U.S. 525, 539 (1885) (explaining that buildings on federal land, "as instrumentalities for the execution of its powers, will be free from any such interference and jurisdiction of the State as would destroy or impair their effective use for the purposes designed").[16] But that does not mean the federal government can exclude *all* state and local authority without satisfying constitutional checks on its power. Any other result would eviscerate the Enclave Clause. There would be no point to requiring state consent if every federal law regulating land use displaced conflicting state laws regardless of consent.[17]

---

[16] The government also claims that Plaintiffs "admit that" acquiring land in trust preempts "state and local laws that frustrate the purposes for which the property was acquired." Gov't Mem. 20. This is wrong. The government's only purported authority for this accusation is Plaintiffs' statement that "[t]he Indian Commerce Clause permits extensive regulation of Indian affairs, including preempting state law in appropriate areas." *Ibid.* (quoting Mem. 14). Had the government read the next sentence, it would know that Plaintiffs explicitly explained that the Indian Commerce Clause does not permit the kind of preemption the government seeks here, because "the Enclave Clause forbids" it. Plaintiffs Mem. 14.

[17] *United States* v. *McGowan*, 302 U.S. 535 (1938), and *United States* v. *Bohn*, 622 F.3d 1129 (9th Cir. 2010), are neither here nor there. Gov't Mem. 22. *McGowan* simply upheld a federal law prohibiting "taking intoxicants into this Indian colony," and favorably cites a case, *Surplus Trading Co.* v. *Cook*, 281 U.S. 647 (1930), that states exactly the proposition Plaintiffs advance here. 302 U.S. at 539 & n.14; see *Surplus Trading*, 281 U.S. at 650 ("It is not unusual for the United States to own within a State lands which are set apart and used for public purposes. Such ownership and use without more do not withdraw the lands from the jurisdiction of the State."). Likewise, *Bohn* merely approved a law requiring motorcycle riders to wear helmets on a federal road, and that regulation was incidental to protecting wildlife in federal parks. 622 F.3d at

III.    **THE GOVERNMENT'S RESPONSE CANNOT BE SQUARED WITH THE CONTROLLING STATUTORY TEXT**

Plaintiffs explained that the agency's decisions also violate 40 U.S.C. 3112. Plaintiffs Mem. 14-16.

Section 3112 mirrors the core requirements of the Enclave Clause. It provides that the federal government (or its agent) may accept jurisdiction over state land but only with "consent" or "cession" by the State. 40 U.S.C. 3112(b). And if the government does not comply with Section 3112(b)—*i.e.*, if the government does not obtain that "consent" or "cession"—Section 3112 *conclusively presumes* that the government *does not* have jurisdiction over the property: "It is conclusively presumed that jurisdiction has not been accepted until the Government accepts jurisdiction over land as provided in this section." 40 U.S.C. 3112(c). As with a failure to satisfy the Enclave Clause, a failure to comply with Section 3112 means the government remains an "ordinary proprietor" subject to the usual state laws (aside from the specific exception discussed above regarding federal instrumentalities). *Paul*, 371 U.S. at 364 & n.30. This statutory backstop to the Constitution's limits on federal authority is significant because even if Congress had the constitutional authority to displace state law without the State's consent, Congress need not exercise that authority to its fullest extent. Rather, Congress can prudently take a more restrained approach to federal-state affairs. And that is precisely what it did with Section 3112.

In response, the government makes almost no effort to engage the text of Section 3112. It does not mention Section 3112(c) or acknowledge the "consent" requirement in Section 3112(b), and its assessment of Section 3112(a) is irrelevant. What is more, the government's quotation of *Adams* v. *United States* (Gov't Mem. 29-30) actually supports Plaintiffs' position: "The Act created a definite method of acceptance of

1132-1133, 1134. Neither case concerned Plaintiffs' constitutional and statutory claims, and the federal laws at issue bore no resemblance to agency decisions completely ousting all state and local authority.

jurisdiction so that all persons could know whether the government had obtained '*no jurisdiction at all*, or partial jurisdiction, or exclusive jurisdiction.'" 319 U.S. 312, 314 (1943) (emphasis added) (citation omitted). Put simply, if the government does not satisfy Section 3112's "method," then it has "no jurisdiction at all." *Ibid.* That is exactly Plaintiffs' point. Because the federal government did not obtain the consent required by Section 3112(b), it lacks jurisdiction to exert the exclusive jurisdiction the agency tried to impose.[18] State and local laws thus remain in force, and the agency's contrary directives are unlawful.

## CONCLUSION

Plaintiffs' motion for summary judgment should be granted, and Defendants' motion for summary judgment should be denied.

Dated: May 2, 2018

/s/ *Lewis P. Geyser*
Lewis P. Geyser
Attorney for Plaintiffs

STRIS & MAHER LLP

/s/ *Daniel L. Geyser*
Daniel L. Geyser
Douglas D. Geyser
Attorneys for Plaintiffs

---

[18] Moreover, the government's conception of Section 3112 is nonsensical. According to the government, the function of Section 3112 is to allow the government to seek "jurisdiction over state land beyond what it possess[es] through preemption." Gov't Mem. 29. But in the government's view, the federal government can pass any law it pleases and exclude any state law it dislikes whenever it buys land. So the "additional jurisdiction" (*ibid.*) adds nothing at all.